Richard A. Hearn (ISB#: 5574)
Lane V. Erickson (ISB#: 5979)
RACINE, OLSON, NYE,
BUDGE & BAILEY, CHARTERED
P.O. Box 1391
Pocatello, Idaho 83204-1391
Telephone: (208)232-6101
Fax: (208)232-6109

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LARAE HARRIS, | **CASE NO. 4:13-cv-00472** |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| TREASURE CANYON CALCIUM COMPANY, an Idaho corporation | |
| Defendant. | |

COMES NOW the above-entitled Plaintiff LARAE HARRIS, by and through her counsel of record, RACINE OLSON NYE BUDGE & BAILEY, CHTD, and hereby states as her claims and causes of action against the above captioned Defendant as follows:

## **INTRODUCTION**

1.      Plaintiff LARAE HARRIS seeks redress against Defendant TREASURE CANYON CALCIUM COMPANY, an Idaho corporation, for violations of Plaintiff's Americans with Disabilities Act rights, Title VII rights, Idaho Human Rights Act rights on the basis of

gender discrimination, disability discrimination, retaliation, and for wrongful termination in violation of all applicable state and federal law.

## JURISDICTION

2.     This Court has original and supplemental jurisdiction over this matter pursuant to 28 USC § 1331 and 28 USC § 1367(a).

3.     Venue is proper in this Judicial District under 28 USC § 1391(b) and (c) because Plaintiff and all of the Defendants either reside in this district or have their principal place of business in this district, and all events giving rise to Plaintiff's claims occurred in this district.

## ADMINISTRATIVE PROCEDURE

4.     Plaintiff fulfilled all conditions precedent to the institution of this action under Title VII as amended under the Civil Rights Act of 1991, as well as under the Idaho Human Rights Act codified at I.C. 67-5901 *et seq.*

5.     On or about January 27, 2012, Plaintiff timely filed a charge of discrimination with the Idaho Human Rights Commission (IHRC) and concurrently with the Equal Employment Opportunity Commission (EEOC) against the Defendants.  Said cases were designated as Complaint Nos. AD-7-0112-284 and 38C-2012-00170 respectively.

6.     On August 1, 2013, Plaintiff received a Notice of Right to Sue from the IHRC concerning Complaint No. AD-7-0112-284.  On October 28, 2013, Plaintiff received a Notice of Right to Sue from the EEOC concerning Complaint No. 38C-2012-00170.

7.     Plaintiff filed this Complaint within 90 days of both the date of and the receipt of the Notice of Right to Sue issued from both the IHRC and the EEOC.

## **THE PARTIES**

8.      Plaintiff LARAE HARRIS (hereafter "Mrs. Harris"), is currently a resident of the City of Idaho Falls, Bonneville County, Idaho.  At all times relevant hereto, Plaintiff was an employee of the Defendant, and during said employment resided in Lava Hot Springs, Bannock County, Idaho.

9.      At all times relevant herein, Defendant TREASURE CANYON CALCIUM COMPANY, (hereafter "Defendant"), was an Idaho corporation with its principal place of business located in Preston, Franklin County, Idaho.  Defendant employed between 25-30 employees.

## **FACTS UPON WHICH PLAINTIFF'S CLAIMS ARE BASED**

10.     Mrs. Harris was hired by the Defendant on June 27, 2008 as a truck driver. During her employment with the Defendant she was the only female that worked at the company.

11.     After a 6 month period, Mrs. Harris was given insurance benefits.  These benefits were given to Mrs. Harris as a result of her good work and due to her being with the company for a period of time.

12.     After Mrs. Harris had worked for one month she became very ill and ended up in the hospital.  Mrs. Harris had an abscess that had ruptured in her abdomen.  Mrs. Harris went in for emergency surgery, was in intensive care for at least 4 days and in the hospital for 10 days total.  In all Mrs. Harris had to be off work for about 4 weeks.

13.     Mr. Derek Steadman, the office supervisor employed by the Defendant visited Mrs. Harris in the hospital.  Additionally, after Mrs. Harris was released from the hospital, she

called her supervisor, Reuel Skinner and told him that she would be off work for at least a month because she had to get daily antibiotics through a PIC line that was in her arm.  Mr. Skinner told Mrs. Harris that was okay and to get better soon.  He also said to come back when she could. They held Mrs. Harris job for her even though another worker was hired in the meantime.

14.     When the mine closed down in October of 2008 (due to the weather), Mrs. Harris was kept on by the Defendant and trained to work in the office and in the lab.  Her office duties included answering the phone, taking orders for product, making sure that the orders were transferred to the Operator's office and put in the proper places.  She also did accounts payable and accounts receivable and all month end billings.  During this time Mrs. Harris also worked on her own initiative to purged paper work and files that began in the 1950's and to update the filing system so that stored files were easier to locate.  Mrs. Harris did all of these tasks to benefit the Defendant.

15.     After a time Mrs. Harris was also trained by the Defendant to do the Driver's Logs and the pre-trip inspection sheet.  This included making sure that times and miles added up and that the pre-trip inspection sheets were properly filed.

16.     Further, Mrs. Harris was also in charge of doing the IFTA sheets from each of the trucks.  She made sure that the miles added up to what was showing on the odometer of each of the trucks at the end of the month.  Mrs. Harris recorded this information into the computer, made spreadsheets that she would print and attach to the month's IFTA sheets and then appropriately filed the IFTA sheets and all accompanying reports necessary to keep Defendant operating pursuant to all applicable laws and regulations.

17.     Additionally, Mrs. Harris was trained by the Defendant to do the Lab work that was needed to insure that Defendant was producing high quality calcium carbonate.  This

entailed taking a sample and "shaking" it to see what percentage of each size the mill was producing. Some companies required a coarser product. Mrs. Harris would take a small sample and then test it to see what percentage of calcium it had. This required using different chemical processes which would allow Mrs. Harris to come up with a percentage. Mrs. Harris would record these findings and after she was finished in the Lab for the day, she put all of the information into a spreadsheet that she had developed for Defendant.

18.     Due to her additional training and responsibilities and to the initiative she had shown in updating and completely organizing the Defendant's records and record keeping processes, when the mining season started for the next year Mrs. Harris stayed mainly at the mill/office.

19.     Essentially, from 2009 on Mrs. Harris duties and work consisted of approximately 95% of her time in the office and 5% of her time out of the office doing other duties. Occasionally, Mrs. Harris would drive truck for Defendant when a need for extra loads existed or when the Defendant was shorthanded for truck drivers.

20.     When she did occasionally drive truck for the Defendant Mrs. Harris had problems with one of the male truck drivers harassing her. Mrs. Harris immediately told her supervisor about these occurrences however, the Defendant did not discipline the male truck driver of take any other action. Mrs. Harris told her supervisor that she really didn't want to work with the man that was harassing her. Mrs. Harris stated that she had plenty of paperwork and tests to complete to keep her busy at the mill/office. The Defendant agreed and Mrs. Harris essentially removed herself from being anywhere near the male truck driver that harassed her.

21.     Mrs. Harris did good work for the Defendant. In the summer of 2009, at her one year anniversary of starting work for the Defendant, she received a raise of $1.25 an hour at.

Mrs. Harris was told by her supervisors that she was doing good work and that Defendant appreciated her efforts in all her responsibilities and duties. Rewards for Mrs. Harris' efforts were also realized by bonuses. The first year Mrs. Harris received a $300.00 Christmas bonus and the next 2 years she received a $500.00 bonus for Christmas.

22.    Additionally, at the direction of the Defendant, Mrs. Harris went to the yearly IFTA symposiums/meetings in Pocatello for further training. These symposiums/meetings were informative and she learned about the new laws that were in place for the year. The Defendant had about 9 trucks that fell under the IFTA regulations and there is a large volume of paper work that must be kept and reported. These yearly symposiums/meetings helped Mrs. Harris with her job and duties in understanding, tracking and completing the required paperwork at the mill/office. Mrs. Harris also worked to see that the Defendant was in compliance with all applicable laws and requirements.

23.    As time went on Mrs. Harris ended up having more duties. The Defendant even had her sign the yearly Christmas cards. Mrs. Harris was told that she was the "voice" of Treasure Canyon and was the person that other companies and the Defendant's clients had the most verbal contact with.

24.    The trust and additional responsibilities the Defendant had for Mrs. Harris continued to grow. In the spring of 2010 Mrs. Harris was trained to deliver product out to the Simplot Company. Mrs. Harris was trained by going on only one trip with a male truck driver. After that Mrs. Harris ended up taking product to Simplot. To the best of Mrs. Harris' knowledge, no other employee was trained in only one trip.

25.    On July 14, 2010, Mr. Skinner the supervisor, asked Mrs. Harris to bring help at the mine by bringing some loads out in the afternoon. Mrs. Harris worked to complete the

important mill/office work and reported to the mine in the afternoon.  Instead of using one on the semis Mr. Skinner asked Mrs. Harris to use a Volvo 10 wheel dump truck which she was not as familiar driving.

26.     Mrs. Harris did the pre-trip on the Volvo and noticed that the brake pedal was extremely close to the floor of the truck.  There were only 2 to 3 inches of clearance between the pedal and the floor.  Mrs. Harris went and told Mr. Steadman that she was concerned that the brakes were not operating correctly and told him that she didn't feel comfortable driving the Volvo dump truck that way.  Mr. Steadman told Mrs. Harris that the Volvo dump truck and the brakes were fine and to go ahead and use the truck.

27.     Mrs. Harris was able to take several loads out of the mine down the steep road to the bottom with the Volvo dump truck.  As Mrs. Harris was leaving the mine headed down hill with her last load, she went from second gear into third gear.  Something didn't seem right. Even though the Volvo dump truck was in the gear, the transmission did not act like it was in the gear.  Mrs. Harris took it out and tried to put it back into third gear again but it did not work.  By this time the Volvo dump truck was rapidly gaining speed.  Mrs. Harris tried to slow the truck down by pushing on the brakes, but the brakes failed.  Mrs. Harris kept trying to get the truck to slow down by gearing "down" but the truck was going so fast that the engine was "screaming". The 50,000 pounds of rock in the Volvo dump truck made it impossible to slow down.

28.     Mrs. Harris did everything she could to keep the truck from flipping as it raced downhill.  She was able to keep the truck from tipping over on the corners, but she knew that as fast as she was going she would never make the last corner which was a 90 degree turn.  In an attempt to save the truck and herself, Mrs. Harris decided instantly that it would better if she drove into the "field" in front of her.

29.     Mrs. Harris drove the truck through a fence, hit a berm and jumped the loaded Volvo dump truck about 27 feet through the air.   The truck landed violently and threw Mrs. Harris around inside the cab despite her seatbelt.   The truck bounded several times but remained upright even though Mrs. Harris had no control.   The truck eventually came to rest at the bottom of a small hill in the field.

30.     Mrs. Harris had a deep gash on her hand.   She was in a great deal of pain throughout her body but was able to call the mill/office and Mr. Steadman answered the phone. She told him what had happened.   Mr. Steadman and several co-workers rushed to the scene and took Mrs. Harris to the hospital.

31.     After many x-rays, CT scans and 16 stitches on her hand it was determined that Mrs. Harris had a break on the top of her humorous bone connecting to her shoulder, had a torn rotator cuff, cut her hand, broken a rib, and severely bruised her face and legs.   The steering wheel came down on her left leg with such pressure that it causes a severe hematoma.   She also had a small puncture wound on her other leg, some bruising on her jaw where it hit the steering wheel, and bruising on her chest that was caused from the seat belt.

32.     Upon her release from the hospital Mrs. Harris immediately filed all necessary and required Worker's Compensation forms and injury reports with the Defendant and with the Idaho State Insurance Fund (ISIF) concerning her work related injuries.   Included with these forms and reports were the medical records providing the diagnosis and prognosis of the injuries she sustained in the July 14, 2010 accident.

33.     Mrs. Harris was off work from the date of the accident until August 2, 2010. At that time Mrs. Harris went back to work in a sling, with instructions to do only light duty work.   She was not able to lift more than 10 pounds and was going to physical therapy 3 times a

week to see if her injuries would improve.  Mrs. Harris was able to complete all of the mill/office work and to complete all of her regular responsibilities and duties.

34.     Mrs. Harris continued to file all necessary reports, and to answer the phone, take orders for product, make sure that the orders were transferred to the Operator's office and put in the proper places and to complete the accounts payable and accounts receivable and all month end billings.  Essentially Mrs. Harris continued to do her job.

35.     Mrs. Harris also went to an orthopedic surgeon in Soda Springs.  He confirmed that the injuries in her left arm and shoulder would require surgery to repair.  Until this was completed and she had recovered, Mrs. Harris would only be fit for office duty work since her injuries were disabling enough to keep her from driving truck.  Mrs. Harris conveyed her diagnosis to the Defendant and spoke several times with Mrs. Steadman about this.  He assured her that this was fine and wouldn't be a problem since 95% of her job was in the mill/office anyway.

36.     After consulting with a surgeon, surgery was scheduled for December 20, 2010, and Mrs. Harris was told that recovery would be 4-6 months with one month off totally and after that first month she could continue to do her mill/office duties.  She related this information to the Defendant and also spoke to Mr. Steadman about this several times.  All indications were that this wouldn't be a problem and that she could continue to do her mill/office duties when she returned to work after one month.  After that Mr. Harris was told that the Defendant wouldn't require her to drive truck until she was cleared by her doctor.

37.     In the first week of December everyone at the company including Mrs. Harris received a $1.00 an hour raise and everyone also received a $500.00 Christmas bonus from the Defendant.

38.     Mrs. Harris continued to remain on light duty restrictions until she had her surgery on December 20, 2010.  Prior to her surgery there had been a lot of talk between Mr. Steadman, Mr. Skinner, and Mrs. Harris about her restrictions and the time of leave she would need following surgery to recover.  The Defendant knew and understood that Mrs. Harris would not be able to drive truck for at least 4 to 6 months after her surgery.  The Defendant also knew that Mrs. Harris would be able to come back to work one month after her surgery to complete her mill/office duties while on "light duty restrictions" from her doctor.

39.     Mrs. Harris had rotator cuff surgery on December 20, 2010.  Her stitches were removed approximately 10 days later.  The surgeon stated that everything looked good at that time.  Mrs. Harris' follow up appointment was scheduled for January 25, 2011, and that she was to remain off of work until that time.  As discussed, Mrs. Harris gave all of this information to the Defendant for purposes of keeping the Defendant up to date.  Mrs. Harris also provided this information in furtherance of the Worker's Compensation claim she had previously provided forms and records for.

40.     As was expected and as discussed with the Defendant, at her appointment on January 25, 2011, the surgeon gave Mrs. Harris a written release to go back to work with the restrictions of only being able to do "one-armed light office work."

41.     On the morning of January 26, 2011, Mr. Steadman called Mrs. Harris on the phone and asked if she was ready to go back to work driving truck.  Mrs. Harris was surprised by this statement because of all of the previous discussions with Mr. Steadman.  When Mrs. Harris told Mr. Steadman that the surgeon had released her for light duty office work which is what she was expecting to come back and do based on all of the previous discussions he stated that he was handling everything fine by himself and didn't need Mrs. Harris' help.

42.     On January 28, 2011, Mrs. Harris was shocked to receive a letter from the owner of the Defendant N. Ross Smith, stating that her employment with the Defendant had been terminated.  Having worked in the office, and being responsible for employee payroll for the Defendant, Mrs. Harris knew that the only other person that had ever been terminated was a man that was smoking pot while on a loader at work.

**COUNT I**
**Disability Discrimination – Americans with Disabilities Act**
**[42 USC 12101 *et seq*.]**

43.     Plaintiff restates all of the facts and allegations set forth in paragraphs 1-42 above and incorporates the same herein by reference as if set forth fully.

44.     Mrs. Harris was employed by the Defendant in the capacity of mill/office worker and as an occasional truck driver.  Mrs. Harris' duties in these capacities were about 95% mill/office work and 5% driving and other work.

45.     On July 14, 2010, while driving a load from the mine, the brakes and gearing on Mrs. Harris dump truck failed and she was involved in a violent accident.  Mrs. Harris was injured and was taken to the hospital by her supervisor and co-workers.

46.     After many x-rays, CT scans and 16 stitches on her hand it was determined that Mrs. Harris had a break on the head (top) of her humorous bone connecting to her shoulder, had a torn rotator cuff, cut hand, a broken rib, bruising to her face, and severe bruising to her legs. The steering wheel came down on her left leg with such pressure that it causes a severe hematoma.  She also had a small puncture wound on her other leg, some bruising on her jaw where it hit the steering wheel, and bruising on her chest that was caused from the seat belt.

47.     Mrs. Harris immediately filed all necessary and required worker's compensation forms and injury reports with the Defendant and with the Idaho State Insurance Fund (ISIF)

concerning her work related injuries.  Included with these forms and reports were the medical records providing the diagnosis and prognosis of the injuries she sustained in the July 14, 2010 accident.

48.     Mrs. Harris was off work for about 2 weeks and then returned with a light duty/office work restriction.  The Defendant was aware of this and had Mrs. Harris continue with her regular mill/office duties and functions.

49.     After consulting with a surgeon, surgery was scheduled for December 20, 2010, and Mrs. Harris was told that recovery would be 4-6 months with one month off totally and after that first month she could continue to do her mill/office duties.  She related this information to the Defendant and also spoke to Mr. Steadman about this several times.  All indications were that this wouldn't be a problem and that she could continue to do her mill/office duties when she returned to work after one month.  After that Mr. Harris was told that the Defendant wouldn't require her to drive truck until she was cleared by her doctor.

50.     In the first week of December, everyone at the company, including Mrs. Harris received a $1.00 an hour raise and everyone also received a $500.00 Christmas bonus.

51.     Mrs. Harris continued to remain on light duty restrictions until she had her surgery on December 20, 2010.  Prior to her surgery there had been a lot of talk between Mr. Steadman, Mr. Skinner, and Mrs. Harris about her restrictions and the time of leave she would need following surgery to recover.  The Defendant knew and understood that Mrs. Harris would not be able to drive truck for at least 4 to 6 months after her surgery.  The Defendant also knew that Mrs. Harris would be able to come back to work one month after her surgery to complete her mill/office duties while on "light duty restrictions" from her doctor.

52.     Mrs. Harris had rotator cuff surgery on December 20, 2010.  Her stitches were removed approximately 10 days later.  The surgeon stated that everything looked good at that time.  Mrs. Harris' follow up appointment was scheduled for January 25, 2011, and that she was to remain off of work until that time.  As discussed, Mrs. Harris gave all of this information to the Defendant.

53.     As was expected and as discussed with the Defendant, at her appointment on January 25, 2011, the surgeon gave Mrs. Harris a written release to go back to work with the restrictions of only being able to do "one-armed light office work."

54.     On the morning of January 26, 2011, Mr. Steadman called Mrs. Harris on the phone and asked if she was ready to go back to work driving truck.  Mrs. Harris was surprised by this statement because of all of the previous discussions with Mr. Steadman.  When Mrs. Harris told Mr. Steadman that the surgeon had released her for light duty office work which is what she was expecting to come back and do based on all of the previous discussions he stated that he was handling everything fine by himself and didn't need Mrs. Harris' help.

55.     On January 28, 2011, Mrs. Harris was shocked to receive a letter from the owner of the Defendant N. Ross Smith, stating that her employment with the Defendant had been terminated.  Having worked in the office, and having been responsible for employee payroll for the Defendant, Mrs. Harris knew that the only other person that had ever been terminated was a man that was smoking pot while on the loader at work.

56.     At the time of her termination Mrs. Harris had been released to work by her surgeon with light/office duty restrictions which would last approximately 4-6 months.

57.     Mrs. Harris' injuries, surgery, and recovery period constitute an actual physical impairment that substantially limited one or more major life activity for Mrs. Harris.

58.     At the time Mrs. Harris' termination, the Defendant had actual records of Mrs. Harris, injuries, surgery, and recovery period.  Further, the Defendant specifically regarded Mrs. Harris has having the injuries, surgery, and recovery period that it had discussed with her on several occasions and had specifically told Mrs. Harris to recover and then come back to work for Defendant at her job completing her mill/office duties and responsibilities.

59.     Prior to her termination, the Defendant had in fact been providing reasonable accommodations to Mrs. Harris to allow her to continue to complete her work and perform all of the functions of her mill/office duties and responsibilities.

60.     Prior to her termination, Mrs. Harris was qualified to do and was in fact completing all of the essential mill/office duties and responsibilities within a short time of the work accident up to her surgery.  Further, the mill/office duties and responsibilities constituted 95% of the work Mrs. Harris was completing prior to the work accident.

61.     By terminating her employment, at time when Mrs. Harris was qualified to do and was in fact completing all of the essential mill/office duties and responsibilities, with the benefit of the reasonable accommodations that were already been in place, the Defendant discriminated against Mrs. Harris due to the disability she suffered from in violation of the Federal American with Disabilities Act 42 USC 12101 *et seq*.

62.     Mrs. Harris was actually damaged by the Defendant's termination of her employment in violation of the Federal American with Disabilities Act 42 USC 12101 *et seq*., The Defendant's actions have caused Plaintiff great mental anguish, humiliation, degradation, loss of enjoyment of life, physical and emotional pain and suffering, inconvenience, lost wages and benefits, future pecuniary losses, and other consequential damages to which she has a right to recover.

63.     As a result of the Defendant's outrageous actions and conduct as alleged here and above, Mrs. Harris is entitled to recover punitive damages from the Defendant in an amount to be determined at trial.

## COUNT II
### Disability Discrimination – Idaho Human Rights Act
### [I.C. § 67-5901 *et seq*.]

64.     Plaintiff restates all of the facts and allegations set forth in paragraphs 1-63 above and incorporates the same herein by reference as if set forth fully.

65.     The same actions and conduct described more fully above, taken by the Defendant against Mrs. Harris, also constitutes disability discrimination in violation of the Idaho Human Rights Act – I.C. § 67-5901 *et seq*.  The Defendant's actions have caused Plaintiff great mental anguish, humiliation, degradation, loss of enjoyment of life, physical and emotional pain and suffering, inconvenience, lost wages and benefits, future pecuniary losses, and other consequential damages to which she has a right to recover.

66.     As a result of the Defendant's outrageous actions and conduct as alleged here and above, Mrs. Harris is entitled to recover punitive damages from the Defendant in an amount to be determined at trial.

## COUNT III
### Wrongful Termination in Violation of Public Policy

67.     Plaintiff restates all of the facts and allegations set forth in paragraphs 1-66 above and incorporates the same herein by reference as if set forth fully.

68.     After the work accident described more fully above, Mrs. Harris continued to remain on light duty restrictions until she had her surgery on December 20, 2010.  Prior to her

surgery there had been a lot of talk between Mr. Steadman, Mr. Skinner, and Mrs. Harris about her restrictions and the time of leave she would need following surgery to recover.   The Defendant knew and understood that Mrs. Harris would not be able to drive truck for at least 4 to 6 months after her surgery.   The Defendant also knew that Mrs. Harris would be able to come back to work one month after her surgery to complete her mill/office duties while on "light duty restrictions" from her doctor.

69.   Mrs. Harris had rotator cuff surgery on December 20, 2010.   Her stitches were removed approximately 10 days later.   The surgeon stated that everything looked good at that time.   Mrs. Harris' follow up appointment was scheduled for January 25, 2011, and that she was to remain off of work until that time.   As discussed, Mrs. Harris gave all of this information to the Defendant for purposes of keeping the Defendant up to date.   Mrs. Harris also provided this information in furtherance of the Worker's Compensation claim she had previously provided forms and records for.

70.   As was expected and as discussed with the Defendant, at her appointment on January 25, 2011, the surgeon gave Mrs. Harris a written release to go back to work with the restrictions of only being able to do "one-armed light office work."

71.   On the morning of January 26, 2011, Mr. Steadman called Mrs. Harris on the phone and asked if she was ready to go back to work, driving truck.   Mrs. Harris was surprised by this statement because of all of the previous discussions with Mr. Steadman and because driving truck had only been an occasional occurrence during her last 2 years of employment. Again, 95% of Mrs. Harris' job duties and responsibilities were in the mill/office.   When Mrs. Harris told Mr. Steadman that the surgeon had released her for light duty office work which is what she was expecting to come back and do based on all of the previous discussions and based

on her previous 2-years of working, he stated that he was handling everything fine by himself and didn't need Mrs. Harris' help.

72.     On January 28, 2011, Mrs. Harris was shocked to receive a letter from the owner of the Defendant, who is named N. Ross Smith, stating that her employment with the Defendant had been terminated.

73.     Mrs. Harris had continued to perform all of her mill/office duties and responsibilities after the accident up to the day of her surgery.  She had even received a raise and a bonus a month before from the Defendant for her work and efforts.

74.     After terminating the Defendant Mrs. Harris learned that the Defendant was upset by her filing forms and reports necessary to make a Worker's Compensation claim for the work accident that had caused her injuries.

75.     In furtherance of her Worker's Compensation claim Mrs. Harris has been faced with resistance and hostility from the Defendant.

76.     Based upon all of the facts and allegations set forth above, it appears that the Defendant terminated Mrs. Harris' employment in part due to her seeking Worker's Compensation benefits and/or filing a Worker's Compensation report and claim.

77.     Termination of an employee who is seeking to exercise a legal right or privilege is such as or pursuing a Worker's Compensation claim is in violation of public policy.

78.     By terminating Mrs. Harris under these circumstances, at this time and in this manner, the Defendant did in fact violate public policy.

79.     Mrs. Harris is entitled to recover as damages her back pay, front pay and additional consequential damages for the Defendant's termination of her employment.

## <u>COUNT IV</u>
### Breach of the Covenant of Good Faith and Fair Dealing

80.     Plaintiff restates all of the facts and allegations set forth in paragraphs 1-79 above and incorporates the same herein by reference as if set forth fully.

81.     Plaintiff's employment contract with the Defendant, even if "at will," constitutes a contract entitling the parties to receive the expectation of the terms and conditions of the contract.

82.     Prior to her surgery there had been a lot of talk between Mr. Steadman, Mr. Skinner, and Mrs. Harris about her restrictions, and the amount of leave she would need following surgery to recover.  The Defendant knew and understood that Mrs. Harris would not be able to drive truck for at least 4 to 6 months after her surgery.  The Defendant also knew that Mrs. Harris would be able to come back to work one month after her surgery to complete her mill/office duties while on "light duty restrictions" from her doctor.

83.     The discussions and expectations from these discussions was that Mrs. Harris would return to work and would continue with her mill/office duties and responsibilities which constituted 95% of the work she had done the previous 2 years for the Defendant.

84.     The Defendant terminated Mrs. Harris while she was recovering from a surgery that resulted from an injury she sustained while working for the Defendant.

85.     The termination of Mrs. Harris by the Defendants constitutes a breach of the covenant of good faith and fair dealing prescribed to every employment contract under the laws of the State of Idaho.

86.     Mrs. Harris is entitled to recover as damages her back pay, front pay and additional consequential damages for the Defendant's termination of her employment.

## COUNT V
### Gender Discrimination in Violation of Title VII of the Civil Rights Act
### [42 USC § 2000(e), *et seq.*]

87.     Plaintiff restates all of the facts and allegations set forth in paragraphs 1-86 above and incorporates the same herein by reference as if set forth fully.

88.     The Defendant terminated Mrs. Harris claiming that she couldn't drive truck any longer for it.  Driving truck constituted only 5% or less of the actual job duties and functions that Mrs. Harris had been employed to perform since early 2009.  Based upon 2 prior years of actual work, 95% of the duties and responsibilities Mrs. Harris was employed by the Defendant to perform was the mill/office work described more fully above.

89.     Having worked in the office, and being responsible for employee payroll for the Defendant, for several years, Mrs. Harris knew that the only other person that had ever been terminated by the Defendant was a man that was smoking pot while on a loader at work.

90.     Mrs. Harris is the only woman who has been terminated by the Defendant under the circumstances and facts set forth more fully herein.  The only man who was terminated up to this time that Mrs. Harris was aware of due to her work in the mill/office was a man who had been smoking pot while at work.

91.     The Defendant's termination of Mrs. Harris under these facts and circumstances evidences that the Defendant was penalizing Mrs. Harris and/or was treating her differently than its other employees due to Mrs. Harris' gender.

92.     Discharging an employee on the basis of gender constitutes a violation of Title VII of the Civil Rights Act 42 USC 2000e *et seq.*

93.     The Defendant's actions have caused Plaintiff great mental anguish, humiliation, degradation, loss of enjoyment of life, physical and emotional pain and suffering, inconvenience,

lost wages and benefits, future pecuniary losses, and other consequential damages to which she has a right to recover.

94.     As a result of the Defendant's outrageous actions and conduct as alleged here and above, Mrs. Harris is entitled to recover punitive damages from the Defendant in an amount to be determined at trial.

**COUNT VI**
**Gender Discrimination in Violation of the Idaho Human Rights Act**
**[I.C. § 67-5901 *et seq*.]**

95.     Plaintiff restates all of the facts and allegations set forth in paragraphs 1-94 above and incorporates the same herein by reference as if set forth fully.

96.     The Defendant terminated Mrs. Harris claiming that she couldn't drive truck any longer for it.  Driving truck constituted only 5% or less of the actual job duties and functions that Mrs. Harris had been employed to perform since early 2009.  Based upon 2 prior years of actual work, 95% of the duties and responsibilities Mrs. Harris was employed by the Defendant to perform was the mill/office work described more fully above.

97.     Having worked in the office, and being responsible for employee payroll for the Defendant, for several years, Mrs. Harris knew that the only other person that had ever been terminated by the Defendant was a man that was smoking pot while on a loader at work.

98.     Mrs. Harris is the only woman who has been terminated by the Defendant under the circumstances and facts set forth more fully herein.  The only man who was terminated up to this time that Mrs. Harris was aware of due to her work in the mill/office was a man who had been smoking pot while at work.

100.     The Defendant's termination of Mrs. Harris under these facts and circumstances evidences that the Defendant was penalizing Mrs. Harris and/or was treating her differently than its other employees due to Mrs. Harris' gender.

101.     Discharging an employee on the basis of gender constitutes a violation of the Idaho Human Rights Act – I.C. § 67-5901 *et seq.*

102.     The Defendant's actions have caused Plaintiff great mental anguish, humiliation, degradation, loss of enjoyment of life, physical and emotional pain and suffering, inconvenience, lost wages and benefits, future pecuniary losses, and other consequential damages to which she has a right to recover.

103.     As a result of the Defendant's outrageous actions and conduct as alleged here and above, Mrs. Harris is entitled to recover punitive damages from the Defendant in an amount to be determined at trial.

## COUNT VII
### Retaliation in Violation of Title VII of the Civil Rights Act
### [42 USC § 2000(e), *et seq.*]

104.     Plaintiff restates all of the facts and allegations set forth in paragraphs 1-103 above and incorporates the same herein by reference as if set forth fully.

105.     In specifically discussing and seeking from the Defendant reasonable accommodations to continue to work due to her disability and in seeking recovery under Worker's Compensation, Mrs. Harris was engaged in protected activities that are afforded to her under applicable law.

106.     The Defendant's termination of Mrs. Harris under these facts and circumstances evidences that the Defendant was penalizing Mrs. Harris and/or was treating her differently than

its other employees due to Mrs. Harris' gender and because she was engaged in the protected activities described more fully herein.

107.    Discharging a female employee under such circumstances constitutes retaliation on the basis of gender in violation of Title VII of the Civil Rights Act 42 USC 2000e *et seq*.

108.    The Defendant's actions have caused Plaintiff great mental anguish, humiliation, degradation, loss of enjoyment of life, physical and emotional pain and suffering, inconvenience, lost wages and benefits, future pecuniary losses, and other consequential damages to which she has a right to recover.

109.    As a result of the Defendant's outrageous actions and conduct as alleged here and above, Mrs. Harris is entitled to recover punitive damages from the Defendant in an amount to be determined at trial.

## COUNT VIII
### Retaliation in Violation of the Idaho Human Rights Act
### [I.C. § 67-5901 *et seq*.]

110.    Plaintiff restates all of the facts and allegations set forth in paragraphs 1-103 above and incorporates the same herein by reference as if set forth fully.

111.    The Defendant intentionally subjected Mrs. Harris to unequal and discriminatory treatment by retaliating against her for seeking reasonable accommodations to continue to work due to her disability and in seeking recovery under Worker's Compensation.

112.    The Defendant's termination of Mrs. Harris under these facts and circumstances evidences that the Defendant was penalizing Mrs. Harris and/or was treating her differently than its other employees due to Mrs. Harris' gender and because she was engaged in the protected activities described more fully herein.

113.    Discharging a female employee under such circumstances constitutes retaliation on the basis of gender in violation of the Idaho Human Rights Act I.C. § 67-5901 *et seq*.

114.    The Defendant's actions have caused Plaintiff great mental anguish, humiliation, degradation, loss of enjoyment of life, physical and emotional pain and suffering, inconvenience, lost wages and benefits, future pecuniary losses, and other consequential damages to which she has a right to recover.

115.    As a result of the Defendant's outrageous actions and conduct as alleged here and above, Mrs. Harris is entitled to recover punitive damages from the Defendant in an amount to be determined at trial.

## ATTORNEYS FEES

116.    As a direct and proximate result of the Defendant's actions and/or failures to act, Mrs. Harris has been compelled to retain the services of counsel, and has thereby incurred and will continue to incur costs, expert witness fees, and attorneys fees which should be required to be paid by the Defendant pursuant to Idaho Code§§ 12-120 and/or 121, 42 USC § 1988(b), and 42 USC § 2000(e)-(k).

## DEMAND FOR JURY TRIAL

The Plaintiff demands trial by jury as to all issues triable to a jury in this action as set forth more fully above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff LARAE HARRIS respectfully prays the Court for a judgment against the Defendant TREASURE CANYON CALCIUM COMPANY, an Idaho corporation, as follows:

A.      All wages and benefits Plaintiff would have received but for the actions of the Defendant, including but not limited to back pay, front pay, future pecuniary losses and prejudgment interest;

B.      Compensatory damages in amount to be determined at trial;

C.      A permanent injunction enjoining the Defendant from engaging in the discriminatory, and/or retaliatory practices complained of herein;

D.      A permanent injunction requiring the Defendant to adopt employment practices and policies in accord and conformity with the requirements of the Idaho Human Rights Act, the Americans with Disabilities Act, and Title VII, 42 USC § 2000(e) et seq;

E.      That the Court retain jurisdiction of this case until such time as it is assured that Defendants have remedied the policies and practices complained of herein, and are determined to be in full compliance with the law;

F.      Punitive damages as allowed by law as against the above-named Defendant;

G.      An award of reasonable attorneys fees, costs and litigation expenses; and

H.      Such other relief as the Court may deem just or equitable.

DATED this 30th day of October, 2013.

RACINE OLSON NYE BUDGE
& BAILEY, CHARTERED


 /s/
LANE V. ERICKSON
Attorney for Plaintiff
