UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LARAE HARRIS,<br><br>     Plaintiff,<br><br>     v.<br><br>TREASURE CANYON CALCUIM COMPANY, an Idaho corporation,<br><br>     Defendant. | Case No. 4:13-cv-00472-BLW<br><br>MEMORANDUM DECISION AND ORDER |

## INTRODUCTION

The Court has before it Defendant Treasure Canyon Calcium Company's Motion for Summary Judgment, or in the Alternative, for Partial Summary Judgment (Dkt. 20), as well as Plaintiff LaRae Harris's Motion to Amend/Correct Complaint (Dkt. 19). The Court heard oral argument on both motions on June 22, 2015, and thereafter requested supplemental briefing, which was submitted on June 24, 2015. Having reviewed all of the evidence, the Court now issues the following decision.

## BACKGROUND

Treasure Canyon Calcium ("TCC") is a family-owned company with approximately 25 employees. TCC mines calcium carbonate from its quarry near Preston, Idaho, which it then prepares in its mill and sells for use in livestock feed and industrial applications. *Def.'s Opening Br.*, at 8, Dkt. 20-1. TCC hired Plaintiff LaRae Harris on

June 25, 2008 as a seasonal truck driver. Her job duties consisted of hauling ore from the quarry to the mill. *Def.'s Opening Br.*, at 8, Dkt. 20-1. At the time she was hired, Harris knew that, like other drivers, she would be laid off at the end of the mining season in the fall, but could be rehired in the spring if her services were needed. *Id.* As a driver, Harris reported primarily to Reuel Skinner, the Mine Manager, and Derek Steadman, the Assisting Manager. *Id.*

When the mining season ended in October of 2008, TCC began to lay off the seasonal workers, as it did each year. *Id.* at 9. TCC President N. Ross Smith knew Harris had had a "difficult year"—her father had passed away, her marriage had ended, and she had suffered an abscess rupture in her abdomen and was unable to work for five weeks. *Id.* Smith asked Steadman if there were any office-related tasks that Harris could do over the winter months so that she could remain employed at TCC. *Id.* Steadman had been doing all of the office-related work up until that point, but he responded that he could find some work for Harris. From the Fall of 2008 through the Spring of 2009, Harris worked in the mill office doing data entry of driver miles and fuel use, entering invoices in accounts receivable, entering invoices in accounts payable and cutting checks for vendors. She also purged older files that were no longer needed and answered the telephone. For her work in the office, Harris was compensated at the same $15.50 per hour rate that she earned as a truck driver. As a full-time employee rather than a seasonal truck driver, she worked at least 30 hours a week and qualified for TCC's health and dental insurance benefits after six months. *Id.*

Harris expected that she would return to driving truck in the spring of 2009. *Harris Dep.*, 101:20–102:4, Dkt. 20-4. However, according to Harris, during the fall of 2008 a fellow driver named Russ Sorenson caused her to run off the road, and then referred to her as "that damn woman driver." *Id.* at 102:10–104:14. Harris reported Sorenson's comments to Steadman sometime in the fall of 2008. *Id.* at 108:17–22. At that time, Sorenson was not working at TCC because the mining season had ended. *Steadman Decl.*, ¶13–14.

In the spring of 2009, Smith asked Harris if she was excited to go back to driving truck. Harris told him that she would rather not drive truck if Sorenson returned to TCC. *Harris Dep.*, 108:23–109:9, Dkt. 20-4; *Smith Decl.*, ¶4, Dkt. 20-10. In order to avoid any future conflicts between Harris and Sorenson, TCC arranged to keep Harris primarily in the office, and taught her to test samples in TCC's quality control lab. *Harris Dep.*, 111:6–112:11. Harris did not make any subsequent complaints to TCC about Sorenson. *Id.* at 119:17–22; *Smith Decl.*, ¶4, Dkt. 20-10; *Steadman Decl.*, ¶14, Dkt. 20-13. In 2009, Harris worked exclusively in the office and the lab—none of her 2028 hours were spent driving truck. In 2010, Harris worked a total of 1,829.25 hours. Of those, approximately 104 hours were spent driving truck and the remaining hours were spent in the office or lab. *Def.'s Statement of Facts*, ¶ 5, Dkt. 20-2.

In the summer and fall of 2010, TCC discovered through testing potential expansion areas in the mine that its available material was not suitable for TCC's use because it was not sufficiently pure. *Smith Decl.*, at ¶ 5, Dkt. 20-10. According to Smith,

this development "jeopardized [TCC's] ability to serve [its] customers, and threatened to force the Company to close." *Id*. Because TCC no longer had access to sufficiently pure stone, its inventory dropped sharply and significantly. *Def.'s Statement of Facts*, ¶ 10, Dkt. 10-2. For example, in October and September of 2009, TCC's inventory consisted of 30,000 and 50,000 tons respectively. *Id*. In contrast, in October and September of 2010, TCC's inventory consisted of only 13,000 and 7,600 tons respectively. *Id*. In December of 2010, TCC's inventory was negative for the first time in recent history. *Id*.

Smith and Steadman elected to take a number of different steps in order to keep TCC in business. First, TCC agreed to buy stone from Lhoist North America, at a premium price, so that it could meet its customer's demands. *Id*. Second, TCC resolved to conduct an exploration program in an effort to find usable stone in its own quarries. *Id*. Third, TCC reduced its workforce so it would have more liquidity to purchase the Lhoist stone. Fourth, TCC raised its prices. Fifth and finally, TCC made modifications to the mill in order to improve efficiency. *Id*. at ¶ 6.

Purchasing external stone was costly. TCC ultimately payed $1.3 million to Lhoist North America for stone: $537,737 in 2010, and $816,885 in 2011. *Def.'s Statement of Facts*, ¶ 11, Dkt. 10-2.

In reducing its workforce, TCC eventually eliminated four[1] positions out of approximately twenty-five. *Id.* at ¶ 7. First, Reuel Skinner, the Mine Manager, retired on December 31, 2010 and TCC chose not to replace him. In January of 2011, TCC decided to eliminate Harris's position, as further discussed below, as well as Jeffrey Brandt's, an assistant truck mechanic, because "their duties could be absorbed by existing employees." *Id.* Finally, a truck-driving position was eliminated. *Smith Decl.*, ¶10, Dkt. 20-10. Initially, TCC had a hard time determining which of the truck drivers should be let go. TCC became concerned that some of the drivers were being purposefully inefficient because of the lack of work, so it decided to terminate the driver who was recording inaccurate hours. On January 31, 2011, Smith sent a letter to each driver asking each of them to sign a statement saying that he or she would be honest in recording his or her hours. No further inaccuracies were detected, and Steadman did not make a recommendation for the layoff until April of 2011. In April, truck driver David Hobbs committed a safety violation, and thereafter Steadman recommended that Hobbs be let go. Smith approved that decision. *Id.*

---

[1] Originally, TCC included a fifth employee, Merlin McKay, in its list of employees who were affected by its reduction in force. *Smith Decl.*, at ¶ 11, Dkt. 20-10. McKay, a mill operator, retired in November of 2010 and was not immediately replaced. However, he then returned to work only one month later, in December of 2010, and continued to work at TCC until November of 2011. McKay's position was not filled after November of 2011. Harris argues in her supplemental brief that McKay cannot reasonably be included in TCC's reduction in force, and TCC does not appear to challenge that, other than to say that McKay's position was not filled during 2011 or 2012.

**MEMORANDUM DECISION AND ORDER - 5**

Six months before her position was eliminated, in July of 2010, Harris was involved in a work-related accident while driving a TCC truck. She suffered a broken humerus, a cut on her hand that required sixteen stitches, a broken rib, bruising to her face and legs, a puncture wound to her leg, and, most significantly, a torn rotator cuff. *Pl.'s Statement of Facts*, at 2, Dkt. 22-1. The day after her accident, Steadman filed a worker's compensation claim with the Idaho State Insurance Fund on Harris's behalf and without her knowledge. *Def.'s Statement of Facts*, at 6, Dkt. 20-2. Harris was released to return to work on August 2, 2010, with certain restrictions. *Id*. at ¶ 7. She needed to attend physical therapy sessions three times per week, and she could not lift more than ten pounds. *Id*. TCC adjusted Harris's hours and duties so that she could continue to work within those restrictions. Harris remained on light duty work at TCC until December 20, 2010, the date she underwent surgery on her shoulder. *Pl.'s Statement of Facts*, at 2, Dkt. 22-1. Harris was cleared to return to "one-arm office work" on January 25, 2011. *Id*. It is undisputed that as of January 25, 2011, Harris was capable of returning to TCC to do the office and lab work that she had previously been doing, but she was not capable of driving truck as she had done in the past. *Id*.

On January 26, 2011, Steadman called Harris. Steadman asked Harris "how she was getting along, how her recovery was going, . . . about [her] ability to drive truck [and] about her ability to return to work at all." *Steadman Depo*. at 76:14–76:17, Dkt. 22-3. Harris told Steadman that she had been released the day before to return to light office work, but that should would not be able to drive truck for four to six months. *Harris*

*Decl.* at ¶ 13, Dkt. 22-8. The following day, Smith called Harris to inform her that her employment was terminated, effective immediately. *Id*. at ¶ 14. Harris received a letter from Smith on January 28, 2011. *Id*. The termination letter indicated that Harris's position was being eliminated because of the economic difficulties that TCC was facing. *Smith Decl.*, ¶8, Dkt. 20-10.

In late 2011 and 2012, TCC began to find usable product as a result of the work of Dwayne Mickelson, a geologist TCC hired in August of 2011. Smith sent a letter to Harris dated June 24, 2012, offering a return to her former position at a slightly higher rate of pay. *Smith Decl.* at ¶ 13, Dkt. 20-10. Harris refused the offer and instead filed suit against TCC.

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources."  *Id*. at 327.  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Anderson v. Liberty Lobby, Inc*., 477

U.S. 242, 247–48 (1986).  There must be a genuine dispute as to any *material* fact—a fact "that may affect the outcome of the case."  *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings.  *Id.* at 255.  Direct testimony of the non-movant must be believed, however implausible.  *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999).  On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence.  *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact.  *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc).  To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case.  *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor.  *Deveraux*, 263 F.3d at 1076.  The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists.  *Celotex,* 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment."  *Carmen v. San Francisco Unified Sch.*

*Dist.,* 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted).   Instead, the "party

opposing summary judgment must direct [the Court's] attention to specific triable facts."

*Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

Finally, statements in a brief, unsupported by the record, cannot be used to create a

factual dispute.  *Barnes v. Independent Auto. Dealers*, 64 F.3d 1389, 1396 n.3 (9th Cir.

1995).

## ANALYSIS

In its Motion for Summary Judgment, TCC argues that summary judgment should

be granted in its favor as to each of Harris's claims: (1) disability discrimination under

the Americans with Disabilities Act ("ADA") and the Idaho Human Rights Act

("IHRA"); (2) wrongful termination in violation of public policy; (3) breach of the

covenant of good faith and fair dealing; (4) gender discrimination under Title VII and the

IHRA; and (5) retaliation under Title VII and the IHRA. Each claim will be discussed in

turn.[2]

### 1.   Discrimination based on disability

TCC argues that Harris has failed to meet her *prima facie* case as to her

discrimination claim under the ADA and the IHRA. TCC's argument is two-fold. It

---

[2] Harris asserts her claims under both federal law and the Idaho Human Rights Act. *See* Idaho
Code § 67-5909. Because the same standards apply under federal and Idaho law, the Court will reference
only federal law in the sections below. *See Bowles v. Keating*, 100 Idaho 808, 606 P.2d 458, 462 (1979)
(adopting the standards promulgated in federal discrimination cases for purposes of analyzing claims
brought under the Idaho Human Rights Act).

asserts that Harris has not demonstrated that she suffered from a disability, and that she has failed to show that her alleged disability played a role in TCC's decision to terminate her. Harris responds that her injuries, particularly to her shoulder, constitute a "disability" because they substantially limited her ability to work. She argues that she was terminated because of her disability, as evidenced by Steadman's deposition testimony where he "admitted . . . that TCC terminated Harris because she could not drive truck or operate a loader." *Pl.'s Resp. Br.* at 9, Dkt. 22. As further discussed below, however, the Court finds that Harris has not provided sufficient evidence that would allow a jury to conclude that her disability, assuming she has one, was a motivating factor in TCC's decision to terminate her employment.

To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show that: (1) she disabled within the meaning of the ADA; (2) she was a qualified individual who was able to perform the essential functions of her job; and (3) she was subject to an adverse employment action because of her disability. *Allen v. Pac. Bell*, 348 F.3d 1113, 1114 (9th Cir. 2003). With respect to this last element, the discriminatory impetus does not need to be the *sole* motive for taking an adverse employment action. *Dark v. Curry Cnty.*, 451 F.3d 1078, 1084–85 (9th Cir. 2006). Rather, the "motivating factor" standard is the applicable one. *Head v. Glacier Nw. Inc.*, 413 F.3d 1053, 1065 (9th Cir. 2005). In other words, the ADA prohibits adverse employment decisions motivated—even in part—by animus toward a plaintiff's disability. *Id.*

Even assuming, without deciding, that Harris was "disabled" as defined in the ADA, she has failed to produce sufficient evidence that would allow a jury to reasonably conclude her disability was a motivating factor in her termination. In response to TCC's contention that any alleged disability was not a motivating factor in her termination, Harris points to her own affidavit. There, she states that as of January 25, 2011, she was capable of performing the office and lab work, but that she was not cleared to drive truck. *Resp. Br.*, at 9, Dkt. 22. But this fact is undisputed and has no bearing on TCC's motivation—actual or perceived—for terminating her. In fact, Harris's affidavit does not discuss why she believes she was let go. *Pl.'s Ex. 8*, at Dkt. 22-8. In addition to her own affidavit, Harris points to a single piece of evidence—an excerpt from Steadman's deposition—which she says constitutes an admission that TCC terminated her because she could not drive truck or operate a loader.

Emphatically, it does not. The relevant portion of Steadman's deposition reads:

Q.     [In the telephone conversation that you had with Harris on January 26, 2011], [i]f she had indicated that she could have driven truck, would her employment at Treasure Canyon be terminated?
. . .

A.     I can't answer that. That's not the scenario that took place, so I think that would be speculation on my part. Her position as an office lab assistant, that position was being eliminated. I was looking for something to try to help – if there was a possibility where she could stay on – you know, looking at different options to see if there would be a possibility that she could stay on somewhere else.

Q.     So you asked her if she could drive truck. Was there a possibility that even if she had said, yes, I can drive truck, that her employment would still have been terminated at Treasure Canyon?
. . .

A.      I don't know.

Q.      But in any case, she would have been able – it would have been a
        requirement for her to be able to drive truck to maintain employment
        at Treasure Canyon; correct?

A.      No.

*Steadman Dep.*, 79:1–80:13, Dkt. 22-3. How this testimony could be construed as an

admission that TCC terminated Harris because she could not drive truck is anyone's

guess. The only evidence Harris points to—Harris's own statement that she was cleared

for office work, and the above-testimony from Steadman—simply does not give rise to a

genuine issue of material fact as to whether Harris's assumed disability was a motivating

factor in her termination.[3]

---

[3] In contrast, see *Nigro v. Sears, Roebuck & Co.*, where the Ninth Circuit held that Nigro's "declaration and deposition testimony, albeit uncorroborated and self-serving, were sufficient to establish a genuine issue of material fact on Sears's discriminatory animus." 784 F.3d 495, 497–98 (9th Cir. 2015). Here however, Harris's declaration and deposition testimony are insufficient to establish a genuine issue of material fact as to TCC's allegedly discriminatory animus. Harris does not point to her deposition testimony as evidence of discriminatory animus, perhaps for good reason. In response to whether she had any factual basis that an injury was considered in TCC's decision to terminate her, Harris responded: "Other than what I told you earlier about if I could drive truck, I could have a job; if I couldn't, I was terminated." *Harris Dep.*, 326:2–4, Dkt. 20-7. But earlier, she merely testified that during the January 26, 2011 telephone conversation with Steadman, he inquired whether she was ready to come back to driving truck. Harris responded in the negative, and then testified that Steadman then "indicated that he was handling the office duty just fine himself, and at that point I don't remember the rest of the conversation. . . ." *Harris Dep.*, 214:20–215:6, Dkt. 20-7. Despite Harris's unreasonable inference to the contrary, Steadman's inquiry regarding whether she was ready or able to drive truck does not mean that she was required to drive truck, or lose her job. Again, less than one percent of her hours worked in 2010 were spent driving truck, so her inability to drive truck had no bearing on why her office position was eliminated.

In sum, Harris has not produced sufficient evidence to create a genuine issue of material fact as to the third element necessary to a disability discrimination claim, even assuming the other two elements were met. Accordingly, summary judgment is granted in favor of TCC as to her ADA claim, as well as her corresponding disability claim brought under the IHRA. *See Bowles v. Keating*, 100 Idaho 808, 812, 606 P.2d 458, 462 (1979).

**2.       Wrongful termination in violation of public policy**

Harris argues generally that TCC terminated her because she filed a worker's compensation claim, which she contends is a violation of public policy. TCC argues that Harris cannot meet her *prima facie* case as to this claim because she did not engage in protected activity. She did not engage in protected activity, TCC argues, because Harris admittedly did not file her own worker's compensation claim. Rather, Steadman filed the worker's compensation claim without Harris's knowledge.  TCC also argues it had a legitimate reason to terminate Harris's employment, and that there is no basis for her assertion that she was terminated for filing a worker's compensation claim. *Def.'s Opening Br.*, at 15, Dkt. 20-1.

In Idaho, "[u]nless an employee is hired pursuant to a contract which specifies the duration of the employment, or limits the reasons why the employee may be discharged, the employee is 'at will.'" *Venable v. Internet Auto Rent & Sales, Inc.*, 156 Idaho 574, 578, 329 P.3d 356, 360 (2014) (citations omitted). Harris does not dispute that her employment with TCC was at-will; as such, she could have been terminated "at any time [or] for any reason without creating liability." *Edmondson v. Shearer Lumber Products,*

139 Idaho 172, 176, 75 P.3d 733, 737 (2003). However, even at-will employees may bring a claim of wrongful discharge. *Jackson v. Minidoka Irrigation Dist.,* 98 Idaho 330, 333, 563 P.2d 54, 57 (1977). Idaho has long recognized "a narrow exception to the at-will employment presumption where the employer's motivation for the termination contravenes public policy." *Bollinger v. Fall River Rural Elec. Co-op., Inc.,* 152 Idaho 632, 640, 272 P.3d 1263, 1271 (2012).

"A termination contravenes public policy 'only where an employee is terminated for engaging in some protected activity, which includes (1) refusing to commit an unlawful act, (2) performing an important public obligation, or (3) exercising certain legal rights and privileges.'" *Venable*, 156 Idaho at 579, 329 P.3d at 361 (citations omitted). This narrow exception exists in order to "balance the competing interests of society, the employer, and the employee in light of modern business experience." *Crea v. FMC Corp.,* 135 Idaho 175, 178, 16 P.3d 272, 275 (2000). To bring a successful claim under the public policy exception, an employee must show (1) that she was engaged in a legally protected activity; and (2) that there is a causal relationship between her engagement in the protected activity and her termination. *Bollinger,* 152 Idaho at 640, 272 P.3d at 1271.

As an aside, both parties assert that the *McDonnell Douglas* burden-shifting framework should apply to Harris's wrongful termination in violation of public policy claim. However, Idaho courts have not yet applied that standard to such a claim. Instead, at the summary judgment stage, Idaho courts carefully review the record to determine

whether reasonable minds could come to differing conclusions regarding why the adverse action was taken. *See Ray v. Nampa Sch. Dist. No. 131*, 120 Idaho 117, 121–22, 814 P.2d 17, 21–22 (1991); *Bollinger*,152 Idaho at 641–42, 272 P.3d at 1272–73 (2012). On the other hand, in an unpublished opinion, the Ninth Circuit has determined that it is "both helpful and proper" to apply the *McDonnell Douglas* framework in a case of wrongful termination in violation of public policy brought under California law. *Waddy v. Sears, Roebuck & Co.*, 97 F.3d 1463, at *2 (9th Cir. 1996). There is also support for the contention that a wrongful termination in violation of public policy claim "is essentially one for retaliatory discharge based upon the exercise of a legal right" and therefore, "the applicable legal standard to be applied is the same as that employed by federal and state courts analyzing Title VII and other unlawful discrimination claims." *Romey v. Hewlett-Packard Co.*, No. CV 98-0274-S-MHW, 1999 WL 34969949 at *6 (D. Idaho Sept. 10, 1999). Because a wrongful termination claim in violation of public policy is a state-based claim, the Court will follow the lead of the Idaho courts and deploy the same analyses as in *Ray* and *Bollinger*.[4]

---

[4] However, if the Court were to utilize the *McDonnell Douglas* framework, the end result would still be the same. Assuming that Harris satisfied her *prima facie* case, TCC met its burden of producing a legitimate reason for her termination. TCC's proffered reason for terminating Harris's employment is that it chose to reduce its force when it failed to find usable product in its mine. Reducing its force was one of several steps that TCC took when it discovered that it was running out of usable product. Harris would then have to demonstrate that this reason is mere pretext. Harris can establish pretext "through evidence showing that [TCC's] explanation is unworthy of belief or through evidence showing that discrimination more likely motivated its decision." *Pottenger v. Potlatch Corp.*, 329 F.3d 740, 746 (9th Cir. 2003). The (Continued)

Harris alleges that she engaged in protected activity when she filed her worker's

compensation claim. The Court agrees that filing a worker's compensation claim is

protected activity for the purposes of bringing a wrongful termination claim. *See Jackson*

*v. Minidoka Irrigation Dist.*, 98 Idaho 330, 334, 563 P.2d 54, 58 (1977) (listing cases

illustrating the public-policy exception to the employment-at-will doctrine, including

*Frampton v. Cent. Ind. Gas Co.*, 297 N.E.2d 425 (Ind.1973), in which the plaintiff was

fired for reporting an injury to her arm so she could file for worker's compensation,

which the Indiana court held to be in clear contravention of public policy); *see also*

*Thomas v. Med. Ctr. Physicians, P.A.*, 138 Idaho 200, 208, 61 P.3d 557, 565 (2002)

("This Court has also indicated that the public policy exception would be applicable if an

---

burden to demonstrate pretext is "not high." *Id*. She must show only that a rational trier of fact could, looking at all of the evidence, find that TCC's explanation was pretextual.

In support of her argument that TCC's rationale is mere pretext, Harris points out that despite an increase in expenses (due to the necessary purchase of the Lhoist stone as well as the costs incurred by hiring a geologist to find usable product), TCC still made a profit for each year from 2009 through 2011. However, Harris does not dispute that in December of 2010, TCC's inventory was negative for the first time in recent history. Nor does she dispute that the lack of usable product in TCC's mines imposed an unexpected cost of $1.3 million to purchase stone externally. That TCC happened to still turn a profit in the years it had to purchase stone externally has no bearing on whether TCC's explanation is worthy of belief. In sum, Harris's evidence on this score does not refute TCC's rationale for her termination and no rational trier of fact could conclude that TCC's explanation was pretextual.

employee were discharged, for example for refusing to date her supervisor, for filing a

worker's compensation claim, or for serving on jury duty.").[5]

Next, Harris must demonstrate there is a causal relationship between the filing of

her worker's compensation claim and her termination. While the question of causation is

generally one for the jury, "it may be decided as a matter of law where there exists no

genuine issue of fact." *Bollinger*, 152 Idaho at 640–41, 272 P.3d at 1271–72. Thus, to

withstand summary judgment as to this claim, Harris must produce more than a scintilla

of evidence, such that a rational trier of fact could reasonably find that she was

terminated because of her worker's compensation claim.

To support her claim that TCC terminated her employment because she filed a

worker's compensation claim, Harris points to the following evidence:

(1) "Steadman admitted in his deposition testimony that Smith decided that it

would be 'kinder' to terminate Harris immediately because she was, at the

time, receiving Worker's Compensation income[;]"

---

[5] TCC points out that it was Steadman—not Harris herself—who filed the worker's compensation claim on Harris's behalf. TCC goes on to argue that it "cannot be found liable for retaliating against itself due to Mr. Steadman's own action on Ms. Harris'[s] behalf." The Court is unwilling to hold that just because TCC filed Harris's worker's compensation claim for her, that that action somehow takes the filing of a worker's compensation claim outside the realm of protected activity. Such a holding could incentivize employers to file workers' compensation claims on behalf of its employees in order to insulate itself from a wrongful termination claim later on.

(2) All four of the TCC employees that had a lost time claim reported to TCC's worker's compensation insurance carrier were either terminated or quit in 2011 or 2012; and

(3) There was only a six-month gap between the time in which Harris's worker's compensation claim was filed and her termination.

*Pl. Response*, at 16, Dkt. 22. Even construing the evidence in the light most favorable to Harris, the Court finds that no rational trier of fact could reasonably find that Harris was terminated because of her worker's compensation claim.

First, the allegation that Steadman "admitted" in his deposition that Harris was terminated because she was receiving worker's compensation benefits misstates the actual testimony given. In fact, Steadman states that the decision to terminate Harris had already been made, prior to any consideration of whether she was receiving worker's compensation. His testimony reads:

> Q:      Did you consider allowing her to continue on medical leave rather than terminating her employment?
>
> A:      I considered that, but after I had given the recommendations to Ross [Smith] on which positions to eliminate, he thought it would be more kind to do it sooner than later for Ms. Harris. Rather than invite her back to work and then lay her off, rather lay her off while she still had [worker's compensation] income.

*Steadman Dep*., 88:24–89:6, Dkt. 22-3. This statement does not, as Harris urges, indicate that there is a causal connection between her termination and receiving worker's compensation benefits. To the contrary, this testimony indicates that Steadman had already recommended that Harris's position be terminated, and that Smith took into

account the fact that Harris was receiving worker's compensation benefits in deciding when to inform Harris of her termination.

Second, Harris's statement that "[a]ll four of the TCC employees that had a lost time claim reported to TCC's worker's compensation insurance carrier were either terminated or quit in 2011 or 2012" needs to be examined in more detail. At the close of the hearing on June 22, 2015, the Court requested supplemental briefing on the issue of whether all of the employees who were terminated had filed worker's compensation claims. The Court has reviewed the supplemental briefing in detail. TCC argues that any statistical evidence should be disregarded because the sample size is too small, but that regardless, Harris's argument distorts the evidence in the record. For her part, Harris clarifies that "[b]y the end of 2011 no employee that had taken worker's compensation lost time income *within the last four years* was still employed at TCC." *Pl.'s Supp. Br.* at 1, Dkt. 32 (emphasis added). The Court finds Harris's statement technically accurate, but nonetheless unpersuasive.

The Court must first consider the admissibility of this statistical evidence with regard to a wrongful termination claim because "[w]hen considering evidence presented in support of or opposition to a motion for summary judgment, a court can only consider material which would be admissible at trial." *Gem State Ins. Co. v. Hutchison*, 145 Idaho 10, 14, 175 P.3d 172, 176 (2007). TCC urges the Court to disregard the evidence as unreliable. In support of its argument, TCC cites to *Sengupta v. Morrison-Knudsen Co.*, where the Ninth Circuit determined that "statistical evidence derived from an extremely

small universe . . . has little predictive value and must be disregarded." 804 F.2d 1072,

1076 (9th Cir. 1986) (internal quotation marks omitted). Similarly, in *Morita v. Southern*

*California Permanente Medical Group*, the Ninth Circuit found that "plaintiff's use of

only eight persons in his statistical analysis is much too small to have any significant

benefit to his position." 541 F.2d 217, 220 (9th Cir. 1976). And in *Aragon v. Republic*

*Silver State Disposal Inc.*, 292 F.3d 654, 663–64 (9th Cir. 2002), the Ninth Circuit held

"the fact that three of the four casuals singled out for lay off that night were white" was

not deserving of "much weight" because of the small sample size. As the Circuit

explained, "[t]he problem with a small number, of course, is that slight changes in the

data can drastically alter the result." *Aragon*, 292 F.3d at 653.

Similarly, Harris's use of four persons in her statistical analysis does not

significantly benefit her position and is not deserving of much weight. Four out of

approximately 25 employees were included in TCC's alleged reduction in force: (1)

Jeffrey Brandt, an assistant mechanic; (2) David Hobbs, a truck driver; (3) Reuel Skinner,

the Mine Manager; and (4) LaRae Harris. *Pl.'s Supp. Br.* at 3, Dkt. 32. Of those four,

Harris claims that three—herself, Brandt, and Hobbs—were involuntarily separated from

employment and all had lost time claims. In contrast, Skinner retired in December of

2010 and was not replaced. *Id*. TCC explains that Brandt's position was terminated

because his position could be absorbed by others, but confirms that Brandt had a total of

three lost time claims: one in 2008, 2009, and 2010 respectively. Additionally, TCC

states that Hobbs was fired after he committed a serious safety violation, and that while

he had a lost time claim in 2009, there was no evidence that his claim was active in 2011.

TCC also points out that one employee with an active worker's compensation claim in

2011, Robert Mansfield, was not included in the reduction in force. Mansfield, a mill

operator, later abandoned his job in May of 2011 after he was arrested in Oregon. *Def.'s*

*Supp. Br.* at 5, Dkt. 31.

To summarize Harris's statistical evidence, then, three of the four employees who

were included in TCC's reduction in force had one or more lost time claims at some point

within the last four years. Of those three, only two—Harris and Brandt—had an active

worker's compensation claim at the time they were terminated. Finally, another employee

who also had an active worker's compensation claim in 2011 was not included in the

reduction in force. The Court concludes that it would be unreasonable to draw the

inference that Harris was terminated because of her worker's compensation claim based

on the facts and circumstances surrounding Harris's data. Not only is Harris's sample size

too small to have much, if any, predictive value, but her data does not account for

possible nondiscriminatory variables, such as TCC's claims that Brandt's job duties could

be absorbed by others and that Hobbs committed a serious safety violation, which led to

his termination. Both by itself and in conjunction with the other evidence submitted,

Harris's statistical evidence fails to create a genuine issue of fact that her termination was

motivated by her worker's compensation claim.

Because Steadman's deposition testimony is not the confession Harris alleges, and

because Harris's statistical evidence has little to no probative value, only temporal

proximity remains. Unfortunately for Harris, case law is clear that "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a *prima facie* case uniformly hold that the temporal proximity must be 'very close.'" *Clark Cnty. School Dist. V. Breeden*, 532 U.S. 268, 273–74 (2001). In *Clark*, a 20-month gap between the alleged protected activity and adverse action suggested "by itself, no causality at all." *Id*. at 273; *see, e.g.*, *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (C.A.10 1997) (3–month period insufficient); *Hughes v. Derwinski*, 967 F.2d 1168, 1174–1175 (C.A.7 1992) (4–month period insufficient). Aside from the six-month gap between the filing of her worker's compensation claim and her termination, Harris has not put forth any additional, reliable evidence that the two were causally connected. And, per established case law, a six-month gap by itself suggests no causality at all.

Having considered all of Harris's evidence, the Court concludes that a rational trier of fact could not reasonably conclude that a causal connection exists between the filing of her worker's compensation claim and her termination. Accordingly, TCC's motion for summary judgment as to this claim is granted and Harris's motion to amend complaint to plead punitive damages as to this claim (Dkt. 19) is moot.

3.      **Breach of the covenant of good faith and fair dealing**

TCC argues that because Harris was an at-will employee, the termination of her employment could not constitute a breach of an implied covenant of good faith and fair dealing because continued employment was not part of the parties' agreement. Harris

counters that a cause of action for breach of an implied covenant of good faith and fair dealing exists in all employment agreements, including at-will relationships, and that there is a genuine issue of material fact as to whether TCC violated that covenant "when it discriminated and retaliated against Harris based on her disability, gender, and worker's compensation claim." *Pl. Response*, at 20, Dkt. 22.

Idaho has long recognized a cause of action for breach of an implied covenant of good faith and fair dealing. *See Metcalf v. Intermountain Gas Co.*, 116 Idaho 622, 778 P.2d 744 (1989), *modified by Sorensen v. Comm Tek, Inc.*, 118 Idaho 664, 799 P.2d 70 (1990). This covenant is found in all employment agreements, including employment-at-will relationships. *Mitchell v. Zilog*, 125 Idaho 709, 715, 874 P.2d 520, 526 (1994); *Sorensen*, 118 Idaho at 669, 799 P.2d at 75. The covenant requires only that the parties perform in good faith the obligations imposed by their agreement. *Jenkins v. Boise Cascade Corp.*, 141 Idaho 233, 242–43, 108 P.3d 380, 389–90 (2005). It "does not create a duty for the employer to terminate the at-will employee only for good cause." *Metcalf*, 116 Idaho at 627, 778 P.2d at 749. Generally, the covenant is breached when an action by one party "violates, qualifies or significantly impairs *any benefit or right* of the other party under an employment contract, whether express or implied." *Metcalf*, 116 Idaho at 627, 778 P.2d at 749 (emphasis added). Most importantly here, "[c]ontinued employment, of course, does not itself constitute a benefit inherent in an express or implied-at-will agreement." *Paolini v. Albertson's Inc., Plan Administrator*, 482 F.3d 1149, 1153 (9th Cir. 2007).

As mentioned, Harris does not dispute that she was an at-will employee. Harris argues that she was terminated "based on her disability, gender, and worker's compensation claim." As an at-will employee, continued employment was not a "benefit or right" she was due at the time she was terminated. Therefore, in terminating Harris's employment—regardless of *why* her employment was terminated—TCC did not deny her any "benefit or right" due.  More importantly, as discussed herein, Harris has not demonstrated that she has a viable claim that she was terminated because of her disability, gender, or worker's compensation claim. Accordingly, there was no breach of the implied covenant of good faith and fair dealing, and TCC's motion for summary judgment as to this claim is granted.

**4.     Discrimination based on gender**

TCC argues that Harris's gender discrimination claim fails as a matter of law because there is no evidence that TCC terminated her employment because of her gender. In her response brief, Harris alleges that she was subjected to discrimination based on gender under two separate theories: disparate treatment and hostile environment. Each theory will be discussed in turn.

**A.     *Disparate treatment***

Title VII prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1). In order to survive summary judgment, a plaintiff must first establish a *prima facie* case of discrimination. *See McDonnell*

*Douglas Corp. v. Green*, 411 U.S. 792, 807, 93 S.Ct. 1817, 1826–27 (1973). If the plaintiff does so, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id*. The plaintiff must then demonstrate that the employer's stated reason for its action is, in fact, pretext. *Id*.

To establish a *prima facie* case of disparate treatment discrimination Harris must show: "(1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subjected to an adverse employment action; and (4) similarly situated men were treated more favorably, or her position was filled by a man." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061–62 (9th Cir. 2002). "A claim of disparate treatment requires direct or circumstantial proof of discriminatory motive." *Washington v. Garrett*, 10 F.3d 1421, 1431–32 (9th Cir. 1993).

Harris fails to satisfy her *prima facie* case because she cannot demonstrate that similarly situated men were treated more favorably, or that her position was filled by a man. While Harris argues that she was "replaced by" a man, case law suggests that an employee is not technically "replaced" when her duties are simply redistributed to others. *Selby v. Pepsico, Inc*., 784 F. Supp. 750, 758 (N.D. Cal. 1991) (no *prima facie* case of discrimination where plaintiff's tasks were divided among remaining employees); *Barnes v. GenCorp Inc*., 896 F.2d 1457, 1465 (6th Cir. 1990) ("[A] person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work."); *see also LeBlanc v. Great American Co.*, 6F.3d 836, 846 (1st Cir. 1993).

Additionally, there is no direct or circumstantial evidence of discriminatory motive here. The only factual allegations that Harris puts forth relating to this claim have to do with her complaints against truck driver Russ Sorenson. But Sorenson, a truck driver, had no involvement whatsoever in Harris's termination. Indeed, when asked whether she had any factual basis for her allegation that she was terminated because of her gender, Harris testified, "I don't have any factual basis for that . . . ." *Harris Dep.*, 325:19-24, Dkt. 20-7.

Harris has failed to satisfy her *prima facie* case and has put forth no evidence that her termination was motivated by her gender; as such, summary judgment as to both her Title VII and IHRA gender-based discrimination claims is granted.

### B. *Hostile environment*

In her Response Brief, Harris claims that she was subject to sexual harassment that created a hostile work environment. *Pl.'s Response*, at 14, Dkt. 22. Harris's entire argument on this score is limited to the following:

> Evidence that even TCC initially found Harris's sexual harassment by Mr. Sorenson to have been sufficiently severe so as to necessitate her transfer from driving truck with Mr. Sorenson to working in the office away from Mr. Sorenson should be sufficient to defeat TCC's SJ Motion on Harris's sexual harassment claims.

*Pl.'s Response*, at 15, Dkt. 22.

As TCC points out, Harris's complaint does not allege a hostile environment claim. Instead, in her complaint, she alleges that she was treated differently than other employees due to her gender. *Compl.* at 19, Dkt. 1. Harris's complaint thus contains a

discrimination claim based on disparate treatment only, which is clearly distinct from a hostile environment claim. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68 (1986). A plaintiff may not raise additional claims for the first time through an opposition to summary judgment brief. *Gilmour v. Gates, McDonald and Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004); (holding that claims raised for the first time in an opposition to a motion for summary judgment are not properly before a court); *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir.1996); *Fisher v. Metro. Life Ins. Co.*, 895 F.2d 1073, 1078 (5th Cir.1990).

Even if Harris's hostile environment claim could be properly raised in her response to a summary judgment motion, that claim has no support in the record.[6] Accordingly, summary judgment as to this claim is granted.

## 5.    Retaliation

Harris argues that summary judgment as to her retaliation claims should be denied "because there are genuine issues of material fact regarding whether TCC terminated Harris's employment in retaliation because she sought an accommodation for her

---

[6] To make out a *prima facie* hostile environment claim, a plaintiff must show that "(1) she was subjected to verbal or physical conduct of a sexual nature, (2) this conduct was unwelcome, and (3) the conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir.1995) (internal quotations omitted). Harris argues that by allowing her to work in the office away from Russ Sorenson, TCC somehow acknowledged that Sorenson's statements were sufficiently severe to alter the conditions of her employment. This argument is wildly unpersuasive. Harris's desired outcome would defy logic, as it would effectively punish TCC for trying to eliminate even the possibility of sexual harassment by granting Harris's request to remain working exclusively in the office.

disability and filed or collected on a worker's compensation claim." *Pl.'s Response*, at

11, Dkt. 22.[7] TCC counters that Harris cannot establish a *prima facie* case of retaliation,

but that regardless, Harris has offered no evidence that TCC's reason for letting her go

was pretext.

To establish a *prima facie* case of retaliation, Harris must show that (1) she

engaged in a protected activity; (2) TCC subjected her to an adverse employment action;

and (3) a causal link exists between the protected activity and the adverse action.

*Hardage v. CBS Broadcasting, Inc.*, 427 F.3d 1177, 1188 (9th Cir. 2005). If Harris

establishes a *prima facie* case, the burden will shift to TCC to articulate a legitimate

nondiscriminatory reason for its decision. *See Ray v. Henderson*, 217 F.3d 1234, 1240

(9th Cir. 2000). If TCC articulates such a reason, Harris bears the ultimate burden of

demonstrating that the reason was merely a pretext for a discriminatory motive. *Id.*

---

[7] Based on this sentence, it appears that Harris intended to argue that requesting an accommodation for a disability also constitutes protected activity. The argument portion of her brief, however, lacks any such analysis. She does not specify what accommodation was requested, when it was requested, or how her request for any accommodation was causally connected to her termination. Similarly, Harris includes a one-sentence argument that TCC's choice to terminate Harris's employment, rather than Russ Sorenson's, creates a genuine issue of material fact as to whether TCC retaliated against Harris because she had reported incidents of sexual harassment. Unequivocally, it does not. Harris's one-sentence argument—which fails to cite to both the record and any controlling authority—is insufficient as a matter of law to create a genuine issue of material fact. Moreover, Harris's reports of sexual harassment were based off of a single incident with Sorenson, and were made in 2008—when Sorenson no longer worked at TCC and a full three years before TCC terminated her. Even assuming that Harris had made a case that her report of sexual harassment by Sorenson was protected activity, Harris has failed to explain how that report was causally connected to the termination of her employment, which occurred over three years later. Thus, the only allegedly protected activity that the Court will consider with regard to Harris's retaliation claim is whether filing and collecting on a worker's compensation claim constitutes protected activity.

Whether the filing of—or collecting on—a worker's compensation claim constitutes protected activity for purposes of a retaliation claim made under Title VII appears to be undecided.[8] However, looking to the plain language of Title VII itself, the Court concludes that neither constitutes protected activity under Title VII.

Title VII retaliation claims have their origin in 42 U.S.C.A. § 2000e-3 "Other unlawful employment practices." That provision provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice *made an unlawful employment practice by this subchapter*, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing *under this subchapter*.

42 U.S.C.A. § 2000e-3 (emphasis added).[9] In other words, Title VII only protects employees "from retaliation for complaining about the types of discrimination it prohibits." *Hamm v. Weyauwega Milk Products, Inc.*, 332 F.3d 1058, 1066 (7th Cir. 2003) (citing *Miller v. Am. Family Mutual Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000) (internal citations omitted)). Harris's retaliation claim fails because her filing of and collecting on a worker's compensation claim does not concern any employment practice

---

[8] *See Miller v. Hersman*, 759 F.Supp.2d 1, 19 (Dist. Of Columbia, 2010) (assuming without deciding that the filing of EEOC complaints, worker's compensation claims, and "whistleblower complaints" were protected activities).

[9] Similarly, a retaliation claim made under the IHRA is based on Idaho Code § 67-5911, which contains near-identical language.

MEMORANDUM DECISION AND ORDER - 29

that violates Title VII. TCC's motion for summary judgment as to Harris's retaliation claims under Title VII and the IHRA is granted.

## ORDER

**IT IS ORDERED:**

1.      Defendant's Motion for Summary Judgment or, in the Alternative, for Partial Summary Judgment (Dkt. 20) is **GRANTED**.

2.      Plaintiff's Motion to Amend/Correct Complaint (Dkt.  19) is **MOOT**.

DATED: September 22, 2015

B. Lynn Winmill
Chief Judge
United States District Court

**MEMORANDUM DECISION AND ORDER - 30**